Filed 07/11/23  G.G. v. Superior Court CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| G.G.,<br><br>    Petitioner,<br><br>    v.<br><br>THE SUPERIOR COURT OF SANTA CLARA COUNTY,<br><br>    Respondent;<br><br>SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND CHILDREN'S SERVICES,<br><br>    Real Party in Interest. | H050923<br>(Santa Clara County<br>Super. Ct. No. 2015-1-JD-023338) |

On January 27, 2023, G.G., a minor child, was placed in protective custody.  Real party in interest Santa Clara County Department of Family and Children's Services (Department) then filed juvenile dependency petitions alleging that the child's mother, petitioner G.G. (Mother[1]), failed to provide adequate care and supervision or protection under Welfare and Institutions Code section 300, subdivision (b)(1)[2], as well as serious emotional damage under section 300, subdivision (c).  The juvenile court subsequently

---

[1] Because Mother and the minor share the same initials, the minor alone shall be referred as G.G.

[2] Undesignated statutory references are to the Welfare and Institutions Code.

bypassed family reunification services under section 361.5, subdivisions (b)(10) and (b)(11), because it found that Mother had not made a reasonable effort to treat her substance abuse problem, and it set a section 366.26 hearing on permanent placement for G.G.

Mother has filed a petition for extraordinary writ challenging the denial of reunification services and requested a stay of the section 366.26 hearing. For the reasons set forth below, we deny the writ petition and the requested stay.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

G.G. is the youngest of Mother's five children. Each of G.G's elder half siblings was removed from Mother's custody, reunification services were terminated for three of them, and Mother's parental rights over the fourth were terminated. Finding that Mother failed to make a reasonable effort to treat the substance abuse problem that led to these terminations, the juvenile court bypassed the family reunification services normally made available when children are removed from a parent's care and proceeded to schedule a hearing on permanently placing G.G. away from Mother.

A.    *Termination of Reunification Services with D.R., A.R., and A.A.*

1.    The 2010 Dependency Proceeding

In May 2010, in the presence of her children D.R., A.R., and A.A., Mother physically attacked her mother (and the children's maternal grandmother). D.R., the oldest who was eight years old at the time, contacted law enforcement, and Mother was arrested for being under the influence of methamphetamine. Because both of the children's fathers were incarcerated, the Department removed D.R., A.R., and A.A. based on Mother's substance abuse, violent behaviors, and neglect of the children's basic needs.

In August and September 2010, the juvenile court ordered family maintenance services for Mother with A.A., the youngest of the three children, and family reunification services for Mother with D.R. and A.R. The court also ordered Mother to engage in, among other things, a residential drug treatment program and a substance abuse parent class as well as random and on-demand drug testing. In February 2011, Mother successfully completed

2

the residential treatment program, which she had entered with A.A., and in November 2011 she moved in with the maternal grandparents, with whom D.R. and A.R. were living.

By the 18-month review hearing in December 2011, all three children had been returned to Mother's custody, and the court ordered them to remain in her care with family maintenance services.

### 2. The 2013 Dependency Proceeding

In February 2013, Mother relapsed and was terminated from her outpatient drug treatment program. The next month D.R., A.R., and A.A. were placed into protective custody. According to the Department, Mother tested positive for methamphetamine on one test, missed multiple others, and exhibited "bizarre, erratic and aggressive behaviors" suggesting mental health problems Additionally, Mother yelled and cursed at the children, played loud music that kept the children awake in the middle of the night, and left home late at night without informing anyone of her whereabouts, causing the children to fear she would not return.

In July 2013, the juvenile court terminated reunification services for D.R. and A.R. and gave their maternal grandparents permanent legal guardianship. In January 2014, the court similarly terminated family reunification services for A.A. and gave permanent legal guardianship to the maternal grandparents.

### B. *Termination of Mother's Parental Rights over E.G.*

When Mother relapsed in February 2013, she was pregnant with a fourth child, E.G., who was born in September 2013. At birth, both Mother and E.G. tested positive for methamphetamine, and E.G. was immediately placed into protective custody. In January 2014, E.G. was declared a dependent of the juvenile court, and in July 2014, the juvenile court terminated Mother's parental rights over E.G. and entered a permanent plan of adoption for the child with a maternal relative.

3

C.    *Prior Proceedings Concerning G.G.*

1.    The 2015 Dependency Proceeding

In 2014, Mother became pregnant with a fifth child, G.G.  In March 2015, three months before G.G. was due, Mother entered a residential drug treatment, but left one week later, against clinical advice.  In early July, shortly after G.G. was born, the Department took the baby into protective custody, and the following month, the juvenile court ordered family reunification services for Mother and G.G, including random drug testing.

This time, Mother did well.  She completed a residential substance abuse treatment program, completed all random drug tests, tested negative on all of them, and developed an aftercare relapse prevention plan.  At the 12-month review hearing, the Department recommended that G.G. be returned to Mother's care, and in February 2016, Mother moved back into her parents' home.  In January 2017, the juvenile court terminated dependency proceedings for G.G., who remained in Mother's care, and Mother continued to receive individual therapy and test negative for substances.

A little over a year later, in April 2018, the juvenile court returned D.R., Mother's oldest child, to her care, and in October 2018, the court granted Mother full legal custody over D.R.

2.    The March 2020 Referral

For nearly two years, Mother continued to do well.  However, as she later admitted, Mother relapsed in December 2019.  In March 2020, the Department received a referral based on concerns about Mother's substance abuse, and in April 2020, Mother tested positive for methamphetamine.  Mother agreed to informal supervision services, and she successfully completed a residential substance abuse treatment program, testing negative on all random weekly drug tests.

3.    The June 2021 Referral

Eighteen months later, Mother relapsed again, and in June 2021, the Department received another referral.  Mother subsequently tested positive for PCP and opiates, and she

4

admitted to using illegal substances while in the home and providing care for G.G.  Mother agreed to allow G.G. to remain with her godmother, with whom G.G. already was staying, to complete a residential substance abuse treatment program, and to participate in random drug testing.  After Mother completed the program and tested negative on all random drug tests, G.G. was returned to her care.

        4.       The November 2022 Referral

The following year Mother had another relapse.  In November 2022, the Department received a referral expressing concern over potential methamphetamine use as well as neglect of G.G.  The next month, Mother once again tested positive for methamphetamine, and she admitted to having relapsed in November 2022.

Mother refused to participate in a residential substance abuse treatment program.  Mother agreed to outpatient treatment, a substance use treatment services assessment and random drug tests.  She also received an appointment with an outpatient treatment provider, but she failed to follow up, and it does not appear from the record that she received any outpatient treatment.

        C.     *The Current Dependency Proceeding*

In January 2023, the Department received another referral concerning neglect of G.G. During the Department's initial contact, G.G.'s maternal grandparents pointed the Department social workers to a methamphetamine pipe and lighter reportedly belonging to Mother, as well as burned curtains and a broken ceiling fan reportedly damaged by Mother. The grandparents also reported that Mother had been offered residential substance abuse treatment but declined it.  D.R. similarly stated that Mother used methamphetamine multiple times a day, often when G.G. was home.  In a subsequent interview, G.G. reported that Mother "smokes" in her presence and took her to a smoke shop to buy "pipes" for her "drugs."  G.G. said that a pipe found in the family home was Mother's and that Mother told her not to speak with the Department.  G.G. also said that she believed Mother would hurt

5

her or her grandparents and that she did not feel safe in Mother's care because Mother was "mean," "smokes drugs," and "hits."

On January 20, 2023, Mother tested positive for methamphetamine. Two weeks later, Mother again tested positive for methamphetamine, and she missed drug tests the following three weeks.

On January 27, 2023, a week after the first positive drug test, the Department placed G.G. into protective custody. Three days later, Mother admitted that, contrary to what she said previously, she had been using methamphetamine either "every day for months" or "on and off" every day since July 2022, and that at times she smoked methamphetamine in G.G.'s presence. Mother also expressed an interest in substance abuse treatment and therapeutic services but continued to refuse to enter a residential substantive abuse treatment program.

On January 31, 2023, the Department filed a juvenile dependency petition alleging that Mother had failed to supervise or protect G.G. and that Mother was unable to provide regular care for the minor due to, among other things, substance abuse. The Department later amended the petition to add allegations that G.G. was suffering serious emotional damage, including "severe anxiety, depression, withdrawal, or untoward aggressive behavior" as a result of Mother's conduct. Subsequently, the Department reported that G.G. presented with stomach issues, which her godmother attributed to stress from her home, and that G.G. was diagnosed with Post Traumatic Stress Disorder.

The Department argued that Mother should not be provided additional reunification services and the court should proceed directly to a permanent placement for G.G. In so doing, the Department invoked the bypass provisions in section 361.5, subdivisions (b)(10) and (b)(11) in light of the termination of reunification services with G.G.s' older half siblings, the termination of Mother's parental rights over E.G., and Mother's failure to make a reasonable effort to treat the substance abuse problem that led to those terminations. At the disposition hearing, the Department argued that Mother had demonstrated a pattern of

6

completing treatment programs but being unable to remain sober or apply relapse prevention techniques, and that her most recent efforts to treat her substance abuse problem were "minimal at best." Finally, the Department argued that reunification services would not be in G.G.'s best interest. G.G. joined in the Department's arguments. Mother opposed, arguing that she had made reasonable efforts to address her substance abuse problems.

On April 4, 2023, the juvenile court granted the requested bypass. After noting that the Department bore the burden of proving, by clear and convincing evidence, applicability of the bypass provisions invoked, the court observed that the first two elements of these provisions—the termination of reunification services or parental rights and similarity in circumstances—"are fairly clear" and satisfied.

The juvenile court then turned to the next requirement: that Mother failed to make a reasonable effort to treat the problem that led to the terminations. It observed that "we have a situation where [Mother] does very well when she's in programs and when she fully engages, but we're seeing a pattern. [Mother] gets clean. She stays clean for a while, sometimes for a long while. She then uses or relapses, does informal services, not always successfully. Then when the children or child is removed, [Mother] gets into programs again." Based on this pattern, the court concluded Mother was willing to treat her substance abuse problem "only when she gets caught" and is "under the microscope." However, she was unwilling to address the problem "on her own" and thus had not shown a "true willingness to change." Accordingly, the court concluded that the Department had satisfied the requirements for the bypass provisions.

The juvenile court next considered whether reunification services were in G.G.'s best interests and observed that "this child is suffering." G.G., the court, noted, was having nightmares and experiencing extreme worry about Mother, which manifested itself physically in stomach pain. G.G. also had observed Mother using substances and relapsing, was able to tell the Department when Mother's pipe was purchased and was able to draw a methamphetamine pipe, and had witnessed Mother's violence toward the grandparents in

7

the home.  In light of this evidence, the court found that Mother had not demonstrated that reunification was in G.G.'s best interests.  The court therefore ordered placement in a non-related extended family member home and set a section 366.26 selection and implementation hearing for July 18, 2023.

On April 10, 2023, Mother filed a timely notice of intent to file a petition for extraordinary writ (California Rules of Court, rule 8.450(e)(4)(A)), and on May 30, 2023, 10 days after the record was filed, she timely filed her petition for extraordinary writ with this court.  (California Rules of Court, rule 8.452(c)(1).)

## II. DISCUSSION

Mother argues that the juvenile court's finding that she had not made a reasonable effort to treat her substance abuse problem is not supported by substantial evidence.   For the reasons set forth below, we disagree and conclude that substantial evidence supports the juvenile court's finding.

### A.     *Standard of Review*

The juvenile court's findings are reviewed under the substantial evidence standard. (*In re Harmony B.* (2005) 125 Cal.App.4th 831, 839; see also *Cheryl P. v. Superior Court* (2006) 139 Cal.App.4th 87, 96.)  The appellant bears the burden of showing that a finding is not supported by substantial evidence.  (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)  In determining whether that burden has been satisfied, "we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order."  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.)

### B.     *The Termination Bypass Provisions*

When a dependent child is removed from a parent's custody, section 361.5 of the Welfare and Institutions Code generally requires that parents receive reunification services. (§ 361.5, subd. (a) ["Except as provided in subdivision (b), . . . whenever a child is removed from a parent's or guardian's custody, the juvenile court shall order the social worker to

provide child welfare services to the child and the child's mother and statutorily presumed father or guardians."]; see also § 361.5, subd. (a)(1) [describing family reunification services].)  The purpose of such reunification services is to " 'eliminate the conditions leading to loss of custody and facilitate reunification of parent and child.' " (*In re I.A.* (2019) 40 Cal.App.5th 19, 23.)  Facilitating reunification " 'furthers the goal of preservation of family' " (*ibid.*), which " 'is the first priority when child dependency proceedings are commenced.' " (*In re Nolan W.* (2009) 45 Cal.4th 1217, 1228.)

Section 361.5, however, contains a number of " 'bypass' " provisions, which allow juvenile courts to deny reunification services and " ' "fast-track" ' " permanent placement of a child.  (*Jennifer S. v. Superior Court* (2017) 15 Cal.App.5th 1113, 1121 (*Jennifer S.*).)  These bypass provisions recognize that there are circumstances in which it would be " 'fruitless' " to provide reunification services (*In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 478), and in which offering such services would be not only " 'an unwise use of government resources' " (*ibid.*), but also may cause unnecessary harm by delaying permanent placement.  (*Jennifer S.*, *supra*, 15 Cal.App.5th at p. 1120.)  Thus, for example, reunification services may be bypassed if a parent's whereabouts are unknown (§ 361.5, subd. (b)(1), the parent has caused the death of another child through abuse or neglect (§ 361.5, subd. (b)(4), or the parent is a registered sex offender. (§ 361.5, subd. (b)(16).)

Section 361.5 also contains two bypass provisions that apply to parents whose rights over another child already have been terminated.  One applies where a court previously has "ordered termination of reunification services for any siblings or half siblings of the child because the parent . . . failed to reunify with the sibling or half sibling" after removal from the parent.  (§ 361.5, subd. (b)(10)(A).)  The other applies where "the parental rights of a parent over any sibling or half sibling of the child had been permanently severed." (§ 361.5, subd. (b)(11)(A).)  In these circumstances, reunification services are not automatically deniable.  When a parent has failed to reunify with a child's sibling or half sibling, or parental rights over a sibling or half sibling have been terminated, the parent is nonetheless

9

entitled to reunification services unless he or she "has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling of that child from that parent." (§ 361.5, subds. (b)(10)(A), (b)(11)(A).)

To invoke these termination bypass provisions, a juvenile court must find their requirements—failure to reunify/termination of parental rights and lack of reasonable effort—satisfied "by clear and convincing evidence." (§ 361.5, subd. (b).) If that is done, " ' "the general rule favoring reunification is replaced by a legislative assumption that offering services would be an unwise use of governmental resources" ' " (*In re William B.* (2008) 163 Cal.App.4th 1220, 1227 (*William B.*)), and the juvenile court "shall not order reunification for [the] parent . . . unless the court finds, by clear and convincing evidence, that reunification is in the best interest of the child." (§ 361.5, subd. (c)(2); see also *William B.*, at p. 1227 ["The burden is on the parent to . . . show that reunification would serve the best interests of the child."].)

C.      *Mother's Efforts*

Mother does not dispute that the first prong of the termination bypass provisions have been satisfied: unchallenged evidence shows that she failed to reunify with G.G.'s oldest half siblings (though one, D.R., was later returned to her custody) and that her parental rights over another half sibling, E.G., were terminated. Instead, Mother argues that the juvenile court erred in finding the second requirement of the termination bypass provisions satisfied: that she has not been making reasonable efforts to treat the drug problems that led to these removals. In so doing, Mother points to her successful participation in treatment programs, completion of supervision services, and periods of sobriety. While these efforts are laudable, other evidence in the record supports the juvenile court's conclusion that her most recent efforts were not reasonable in the face of her repeated relapses and that she has not shown a true willingness to change.

In determining whether a parent has made a "reasonable effort" to treat a problem, juvenile courts strike a balance. On the one hand, the "reasonable effort" standard does not

10

require parents to " ' "cure" ' " their problem (*Jennifer S.*, *supra*, 15 Cal.App.5th at p. 1121) or even to show " 'a certain level of progress.' " (*R.T. v. Superior Court* (2012) 202 Cal.App.4th 908, 914 (*R.T.*).)  On the other hand, parents must make more than a " 'lackadaisical or half-hearted' " attempt to treat the problem.  (*K.C. v. Superior Court* (2010) 182 Cal.App.4th 1388, 1393.)  Moreover, even "clearly genuine" efforts to treat a problem may not be reasonable in light of the "duration, extent and context" of the efforts as well as their "quality and quantity."  (*R.T.*, *supra*, 202 Cal.App.4th at p. 914, italics omitted.)

Although the juvenile court acknowledged Mother has done well in treatment programs and even had a "three-and-a-half-year period of sobriety," it nonetheless found that she had not continued to make a reasonable effort to treat her drug abuse problem.  The court observed that Mother had a pattern of relapsing between dependency proceedings and that she was willing to address her drug problem and attempt to change "only when being watched by the Department, but not on her own."  Accordingly, it concluded that Mother had not shown "a true willingness to change."

This conclusion is supported by substantial evidence.  Mother did well right after G.G. was born: she successfully completed a residential substance abuse program, consistently tested negative, and developed an aftercare relapse prevention program.  As a consequence, G.G. was returned to her care in February 2016, dependency proceedings were terminated in January 2017, and there were no referrals until December 2019.  Since then, however, Mother has suffered repeated relapses, testing positive for methamphetamine in the spring of 2020, June 2021, December 2022, and January 2023.  Indeed, in January 2023 Mother admitted that she had been using methamphetamines continuously for six months.

Recently, however, Mother has made little effort to treat her drug abuse problem. There is no evidence that, despite her many relapses, she ever sought treatment independently and without pressure from the Department.  Indeed, far from seeking help with her problem, Mother tried to conceal it.  For example, when initially questioned about

11

her drug use, Mother denied it. At another point, she avoided speaking with a social worker by claiming to be someone else. And she even told G.G. to lie in hopes of concealing her drug use.

Mother also failed to take significant action after the Department most recently removed G.G. Despite the removal, Mother has continued to use methamphetamines, testing positive on January 20, 2023 and February 6, 2023 (as well as missing subsequent tests). To the contrary, she has refused to participate in a residential substance abuse treatment program even though she successfully participated in such programs in the past. In addition, although she made some preliminary arrangements for outpatient services, there is no evidence that she followed through. In other words, far from intensifying her efforts in light of her recent relapses and the removal of G.G., Mother has refused to take measures that previously appeared to help her. As a consequence, the trial court had ample grounds for finding that Mother has addressed her drug use problem only when forced to do so and has not shown a true willingness to change.

While Mother disputes this conclusion, she is unable to point to evidence that she made any independent effort to deal with her drug abuse problem or made significant recent efforts to obtain treatment. Instead, she focuses primarily on her successful participation in programs after G.G.'s birth in 2015, her participation in a residential program in 2020, and her efforts in 2021. Mother also points to her most recent efforts: in December 2022 she "engaged in safety planning," "completed a Substance Use Treatment Services assessment," and "made an appointment with an outpatient program." But she is unable to point to any evidence that she actually participated in the outpatient program. Mother's repeated relapses show that she has a very serious and difficult drug abuse problem that demands much greater effort.

In *R.T. v. Superior Court*, *supra*, 202 Cal.App.4th 908, the Court of Appeal upheld a finding that in similar circumstances a parent had not made a reasonable effort. In *R.T.*, before the child at issue in the proceeding was born, his mother's rights over a sibling were

12

terminated because of substance abuse and chronic homelessness. (*Id.* at p. 911.) The child was later removed several times due to drug and alcohol abuse, and there were several referrals as well before the child was removed a final time. (*Id*. at pp. 911-912.) After the final removal, the mother moved to a safe residence, and started attending a drug treatment program to treat her drug abuse problem. Although the Court of Appeal indicated that the mother's effort was genuine (*id*. at pp. 914-915), it concluded that the effort was not reasonable for two reasons. First, the mother made little independent effort to treat her drug abuse problem. Other than participating in a perinatal program, she took no action to address her substance abuse problem after her first child was born, and although she successfully completed a drug program before her second child was removed, she made no effort to treat her problem once he was returned. (*Id*. at p. 915.) Second, after her second child was again removed, she failed to take significant action: to the contrary, for several months afterwards she failed to engage in drug treatment services in any meaningful way. (*Ibid*.)

Substantial evidence supports the juvenile court's conclusion that Mother similarly failed to make a reasonable effort to treat her substance abuse problems. Like the mother in *R.T.*, Mother made no independent effort to treat her substance abuse problem. While she completed drug treatment programs after G.G. was removed, once G.G. was returned Mother took no action on her own to treat her substance abuse problem. In addition, after G.G. was most recently removed, Mother failed to engage in treatment in any meaningful way. If anything, Mother's efforts here were less reasonable than those of the mother in *R.T.* because Mother actively concealed her relapse, continued to test positive for methamphetamine, and refused treatment in which she previously had participated successfully. Mother points out that she enjoyed a longer period of sobriety than the mother in *R.T.* That period, however, ended in 2020, and Mother has suffered repeated, and lengthy, relapses since then. As a consequence, Mother's prior success does not make her current effort reasonable.

Accordingly, we conclude that the juvenile court's finding that Mother has not made a reasonable effort to treat her drug abuse problem is supported by substantial evidence.

D.  *Best Interests of the Child*

As noted above, if the juvenile court finds a bypass provision applicable, the burden of proof shifts to the parent to prove that reunification would serve the child's best interest. (§ 361.5, subd. (c)(2); (*William B.*, *supra*, 163 Cal.App.4th at p. 1227.)  Although Mother argues that any error in denying reunification services was not harmless, she does not dispute that she failed to show that reunification would be in G.G.'s best interest.  Indeed, Mother does not dispute the juvenile court's findings that G.G. "is suffering severe emotional damage," including not only "extreme worry about her mother," "extreme anxiety and depression," "nightmares," and "night terrors," but also physical manifestations of these emotional challenges in the form of "stomach pains . . . when there's no underlying physical issue."  In light of this evidence, the juvenile court properly denied reunification services and scheduled a section 366.26 hearing.

### III.   DISPOSITION

The petition for extraordinary writ and the request for stay are denied.

_____

Bromberg, J.

WE CONCUR:

_____

Greenwood, P.J.

_____

Danner, J.

*G.G v. Superior Court*
H050923

15